# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| In re: | Case No. 19-56749-tjt |
| CORALREEF PRODUCTIONS, INC., | In Proceedings Under Chapter 11 |
| Debtor. | Hon. Thomas J. Tucker |
| _____/ | |

## DECLARATION OF ANTHONY TOMA IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

In support of the above-captioned Debtor's chapter 11 petition and its first day pleadings, I, Anthony Toma declare the following in this declaration (the "Declaration"):

1. Except as otherwise stated, I make this Declaration upon personal knowledge, and if called as a witness I could competently testify to the facts contained herein.

2. Since 2003, I have been the Debtor's President. In this position, I am responsible for making all strategic decisions as well as all high-level marketing and operational decisions for the Debtor.

3. The Debtor filed a voluntary petition for relief (the "Chapter 11 Case") under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") on November 26, 2019 (the "Petition Date") in the Bankruptcy Court.

4. The Debtor continues to operate its business and manage its assets as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.[1] I have been informed by counsel that no request has been made for the appointment of a trustee or examiner, and no official committee has yet been appointed by Office of the United States Trustee.

5. This Declaration describes the Debtor's business, the circumstances surrounding the commencement of Debtor's Chapter 11 Case, and relevant facts for the purposes of supporting the First Day Motions. Nothing herein is intended to be or should be construed as an admission with respect to the validity of any claims, security interests, liens, contractual defaults or any other rights or interests that may be asserted against the Debtor. The statements made herein regarding debts, obligations, defaults, and liens represent only assertions made by creditors of the Debtor or that the Debtor anticipates will be made by creditors and does not constitute a belief on the part of the Debtor that these assertions are true and/or accurate.

## BACKGROUND

### THE DEBTOR'S BUSINESS

6. The Debtor is a subchapter S corporation formed under the laws of the State of Michigan in 2003. The Debtor is in the entertainment and advertising

---

[1] Unless otherwise noted to the contrary, all section references herein are references to sections of the Bankruptcy Code.

industries (the "Industry"), and it is an entertainment and marketing company that works with models and actors (i.e. talent) (the "Business").

7. In its Business, the Debtor assists its clients, both aspiring talent and experienced talent, by helping them get started in the Industry and/or furthering their careers. The Debtor does this by providing its clients with the tools and support they need, which includes, but is not limited to, photography/video services, creating online client profiles, maintaining a searchable database of its clients on its website, as well as other ancillary services such as hair, makeup and fashion advice. The Debtor also works with production companies and other professionals in the Industry to identify appropriate opportunities for its clients.

### The Debtor's Ownership Structure

8. I own 100% of the Debtor's issued and outstanding stock.

9. I am employed by the Debtor. Prior to the Petition Date, I received a salary of $219,000/year from the Debtor, plus health care benefits, automobile allowance of $346.74/month, payment of my life insurance premium of $1,942.40/month, and travel expense reimbursement for business related travel.

### Cash Collateral

10. None of the Debtor's creditors holds an interest in the Debtor's cash collateral.

## EVENTS LEADING UP TO THE BANKRUPTCY FILING

11. From 2015 through the Petition Date, the Debtor did business as Nine9, the UnAgency. Before then, the Debtor did business as One Source Talent of Troy, Michigan ("One Source"). However, in 2014 the Debtor, was sued in California (the "Lawsuit") under the Krekorian Talent Scam Prevention Act (the "Krekorian Act").

12. The Krekorian Act, enacted in 2010, made it illegal for "talent listing services" to charge clients for auditions, and required them to clearly state in their contracts that they are not talent agencies. The Lawsuit claimed that the Debtor while doing business as One Source used a contract that was not compliant with the Krekorian Act.

13. The Lawsuit was settled in 2016 (the "Settlement"), and it required the Debtor to, among other things, pay over $600,000 to create a fund be shared by its former clients, pay certain legal fees, provide over $900,000 of free services to former clients and refund approximately $60,000 to certain former clients. The Settlement created a liquidity crisis for the Debtor. As a result, the Debtor was unable to pay all of its payroll related taxes for parts of 2016, 2017 and 2019.

14. In addition, prior to the Settlement the Debtor had 13 offices. The liquidity crisis caused by the Settlement forced the Debtor to reduce its monthly operating expenses. The Debtor's most significant cost cutting measure was the closing of 9 of its offices (located in Cleveland, Dallas, Houston, Los Angeles,

Miami (Ft. Lauderdale), San Francisco, New Jersey, Washington DC, and New York City). This created significant lease cancellation debt.

15. After closing these 9 offices the Debtor only had 4 remaining offices (located in Detroit, Chicago, Atlanta and second office in New York City).

16. The strains upon cash flow arising from the Lawsuit, limited Debtor's ability to pay substantial amounts of payroll withholding taxes to the IRS and other payroll related taxes to various state taxing authorities. As a result:

    a. On March 16, 2018, the IRS filed a Notice of Federal Tax Lien for $813,999.77 with the State of Michigan Uniform Commercial Code Unit. Then, on December 19, 2018, the Debtor and the IRS entered into an installment agreement (the "IA"). The IA claimed that the Debtor owed $720,693.29 to the IRS. Under the IA, the Debtor agreed to pay the IRS $12,500.00/month beginning on January 20, 2019, and to increase the payment to $15,000.00/month on January 20, 2020. Prior to the Petition Date, the Debtor made 7 installment payments to the IRS (6 for $12,500 for March through August of 2019, and 1 for $12,607 for September of 2019).

    b. On or around October 26, 2018, the Debtor and the State of Georgia entered into an installment agreement (the "Georgia Agreement"). The Georgia Agreement claimed that the Debtor owed the State of Georgia $23,173.59 for unpaid withholding taxes. Under the Georgia Agreement, the Debtor agreed to make several lump sum payments as well as payments of $1,000.00/month until the balance was paid in full. The Debtor has made most of these payments, and, as of Petition Date, the Debtor believes that its outstanding balance due to the State of Georgia is $2,685.61.

    c. On October 21, 2019, the State of Michigan sent a Notice to Withhold to Comerica Bank (the "Garnishment"). The Garnishment claimed the Debtor owed the State of Michigan $151,787.05 (which includes penalty and interest) for unpaid unemployment taxes. As a result of the Garnishment, on October 29, 2019, Comerica notified the Debtor that it levied its bank accounts for $27,321.28.

d. On November 6, 2019, the Debtor and the Illinois Department of Employment Security entered into a deferred payment agreement (the "Illinois Agreement"). The Illinois Agreement claimed that the Debtor owed the State of Illinois $8,966.46 for unemployment taxes. Under the Illinois Agreement, the Debtor agreed to pay $2,241.62 on November 27, 2019 and then to make monthly payments of $615.95/month on the 17th of each subsequent month until the balance is fully paid.

e. On November 25, 2019 the Debtor's Comerica Bank account was garnished for $22,854.19. As of the Petition Date, the Debtor does not know who garnished its account.

17. As a result of the strain on cash flow resulting from the unpaid taxes owed to the IRS, and to various other states, the Debtor has determined that it is in its best interest to commence this Chapter 11 case in order to reorganize its business and give it time to repay the various taxing authorities.

### THE FIRST DAY MOTIONS

18. To minimize the adverse effects of the bankruptcy filing on its Business, the Debtor has requested various types of "first day" relief (collectively, the "First Day Motions") that is intended to allow the Debtor to maintain its ongoing business operations and fulfill its duties as a debtor-in-possession.

19. I make this Declaration to assist the Court and other parties-in-interest in understanding the circumstances that compelled the Debtor to file the following First Day Motions:

a. *First Day Motion for Order Authorizing Payment of Pre-Petition Wages, Salaries and Employee Benefits* the "Wages Motion"); and

{00825658.1}                                                  6
19-56749-tjt    Doc 9    Filed 11/27/19    Entered 11/27/19 11:36:55    Page 6 of 12

b. *First Day Motion for Entry of an Order to Continue Using Pre-Petition Bank Account and Form* ("Bank Account Motion").

20. I believe the relief sought in each of the First Day Motions is: (i) necessary for the Debtor to make a successful transition to and operate in chapter 11 with minimal interruption or disruption to its business, and (ii) constitutes a key factor in maximizing and preserving the value of the Debtor's estate.

## I. THE WAGES MOTION

21. The Debtor employs approximately 58 employees overall (the "Employees"). Of these Employees, 7 are paid salary, 25 are paid hourly, 4 are paid the greater of their salary or earned commissions, and 22 are paid the greater of their hourly earnings or earned commissions.

22. The majority of the value of Debtor's business arises from its ongoing operations. The Employees are instrumental in allowing the Debtor to continue operating as a going concern.

23. The Debtor pays its employees one week in arrears every other week. The Debtor's pay period begins on Saturday and ends 14 days later on Friday. To illustrate, paychecks issued on Friday, November 29, 2019 cover the 14-day period that begins on Saturday, November 9, and ends on Friday, November 22, 2019.

24. The Debtor pays its Employees their wages by issuing checks directly to them. The Debtor also pays all employee related local, state and federal taxes by issuing checks directly to each respective taxing authority.

25. The Debtor pays its Employees their wages by issuing checks directly to them. The Debtor also pays all employee related local, state and federal taxes by issuing checks directly to each respective taxing authority.

26. The Debtor provides medical, dental and vision benefits (collectively, the "Medical Benefits") to its Employees. The Medical Benefits are provided through Blue Cross Blue Shield of Michigan. The aggregate cost of the Medical Benefits is approximately $9,950.00 per month. The Employees, through payroll deductions, pay approximately $927.86 per month towards their Medical Benefits, and the Debtor pays the balance. The Debtor anticipates that the cost of the Medical Benefits will increase by approximately 10% in January of 2020.

27. The Debtor: (a) does not provide any life or accident insurance to its Employees, (b) has not established a 401(k) plan for its Employees, and (c) does not provide any other type of retirement benefits to them.

28. Finally, as of the Petition Date, the Debtor was obligated to remit deductions taken from its Employee's paychecks for: (a) income tax withholdings, and (b) garnishments, child support, or other employee wage deduction orders (collectively, the "Prepetition Deductions"), and to pay them over to various third parties.

## II. THE BANK ACCOUNT MOTION

29. Prior to the Petition Date, the Debtor maintained 3 general purpose bank accounts: (i) Comerica Bank account number ending in 6935 (the "First

Comerica Account"), (ii) Comerica Bank account ending in 5656 (the "Second Comerica Account"), and (iii) Bank of America account number ending in 2562 (the "BoA Account").

30. The Debtor used the First Comerica Account for:

   a. paying payroll, payroll taxes, rent and other operating expenses for its offices located in Detroit, Chicago, Atlanta and New York;

   b. depositing the Fees paid by credit card for its Detroit, Chicago, and Atlanta offices; and

   c. depositing Fees paid in cash for its Detroit office.

31. The Debtor used the Second Comerica Account for:

   a. depositing Fees paid by credit card for its New York Office; and

   b. transferring these funds to the Debtor's First Comerica Account.

32. The Debtor used the BoA Account for:

   a. Depositing Fees paid by cash in its NY, Atlanta and Chicago offices;

   b. Paying expenses such as travel and office supplies for its NY, Atlanta and Chicago offices, and

   c. Transferring funds to the Debtor's First Comerica Account.

33. The Debtor believes that the potential delay in receiving payments from its numerous, individual customers resulting from the closing its First

37. The First Day Motions seek various forms of relief which the Debtor requires in order to allow it to continue operations and maintain the going-concern value of the Debtor's business and prevent irreparable financial harm to the Employees and other parties. The relief sought is, therefore, critical to the success of the Debtor's reorganization efforts, and the need to have the First Day Motions heard as soon as practicable outweighs any concerns that expedited hearing on these motions might raise.

38. For the reasons set forth herein, it is necessary that the Debtor obtains an interim hearing on the First Day Motions (the "First Day Hearing") on December 4, 2019, or as soon thereafter as possible.

39. I have been informed that a proposed order scheduling a hearing on the First Day Motions is being filed pursuant to Local Rule 9013-1(c).

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the above statements are true and correct.

_____
Anthony Toma

Dated: November 27, 2019

Comerica Account and opening a new DIP account will seriously disrupt its operations by, among other things, delaying its ability to seamlessly continue collecting its recurring monthly payments from its numerous individual customers.

34. The Debtor also believes that closing its Second Comerica Account and BoA Account will also disrupt its operations.

35. The Debtor further believes that after the Petition Date it would be better for it operationally, to process and pay its payroll and payroll taxes through a commercial payroll service such as Paychex or ADP as soon as it can practicably commence using such a service.

36. The Debtor also uses a variety of business forms. In order to minimize expenses to the estate, and to minimize disruption of its business, the Debtor also requests that it be authorized to continue to use all correspondence, business forms (including, but not limited to, letterhead, stationary, purchase orders, employment applications, invoices, etc.) and checks in the form that they exist immediately prior to the Petition Date (collectively, the "Business Forms"), without reference to the Debtor's status as a debtor-in-possession. Use of new business forms would increase the Debtor's costs and add to the administrative burdens of transitioning to operations under chapter 11.

### III. DEBTOR'S NEED FOR SHORTENED NOTICE AND IMMEDIATE HEARING ON FIRST DAY MOTIONS

37. The First Day Motions seek various forms of relief which the Debtor requires in order to allow it to continue operations and maintain the going-concern value of the Debtor's business and prevent irreparable financial harm to the Employees and other parties. The relief sought is, therefore, critical to the success of the Debtor's reorganization efforts, and the need to have the First Day Motions heard as soon as practicable outweighs any concerns that expedited hearing on these motions might raise.

38. For the reasons set forth herein, it is necessary that the Debtor obtains an interim hearing on the First Day Motions (the "<u>First Day Hearing</u>") on December 4, 2019, or as soon thereafter as possible.

39. I have been informed that a proposed order scheduling a hearing on the First Day Motions is being filed pursuant to Local Rule 9013-1(c).

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the above statements are true and correct.

_____
Anthony Toma

Dated: November 27, 2019

{00825658.1}   11

19-56749-tjt   Doc 9   Filed 11/27/19   Entered 11/27/19 11:36:55   Page 12 of 12